**In re Petition of the BOARD OF DIRECTORS OF HOPEWELL INTERNATIONAL INSURANCE, LTD., as Scheme Administrators of Hopewell International Insurance, Ltd., Debtor in a Foreign Proceeding.**

**No. 98–B–45440 ALG.**

United States Bankruptcy Court, S.D. New York.

Jan. 17, 2002.

See also 238 B.R. 25.

Chadbourne & Parke LLP, (Howard Seife, Esq., Marjorie L. Cohen, Esq., Andrew Rosenblatt, Esq., Of Counsel), New York City, for the Board of Directors of Hopewell International Insurance Ltd.

Allen & Overy, (Ken Coleman, Esq., Steve Doody, Esq., Ingrid Bagby, Esq., Of Counsel), New York City, for Gold Medal Insurance Company.

Seward & Kissel LLP, (Ronald L. Cohen, Esq., Of Counsel), New York City, Co-counsel for General Mills, Inc.

Zelle, Hofmann, Voelbel, Mason & Gette LLP, (Lawrence Zelle, Esq., Lawrence T. Hofmann, Esq., Of Counsel), Minneapolis, MN, Co-counsel for General Mills, Inc.

## MEMORANDUM OF DECISION

ALLAN L. GROPPER, Bankruptcy Judge.

█ This is a further chapter in the extended insolvency proceedings of Hopewell International Insurance Ltd. ("Hopewell"), a Bermuda company that reinsured captive insurers, some located in the United States.[1] In 1995 the Supreme Court of Bermuda sanctioned Hopewell's Scheme of Arrangement, which is roughly comparable to a plan of reorganization in the United States, and in 1999 this Court, acting under 11 U.S.C. § 304, entered an order dated September 21, 1999 (the "1999 Order") enforcing Hopewell's Scheme in the United States. The 1999 Order reserved jurisdiction in this Court "with respect to the enforcement, amendment or modification" of the Order, a power which the Court inherently possesses in any event. Recently, Gold Medal Insurance Company ("Gold Medal"), the captive insurer of General Mills, Inc. ("General Mills") and the undisputed target of the § 304 proceedings, sought a modification of the 1999

Order. Hopewell filed papers in response thereto, but prior to the hearing on the motion, it obtained an injunction from the Bermuda court (the "2001 Injunction") prohibiting Gold Medal and its agents from "taking any step" in the § 304 case to modify or vacate the 1999 Order. Hopewell's position before this Court is that Gold Medal would be in contempt of the 2001 Injunction and subject to sanctions in Bermuda if it argued its case on the merits before this Court.

As will appear hereafter, Hopewell's anti-suit injunction is a direct infringement of this Court's jurisdiction and wholly at odds with the developing law of cooperation in international insolvencies. It requires a response that appropriately protects this Court's jurisdiction while recognizing that, as Hopewell argues, this is the "ancillary" and not the "main" proceeding in this insolvency. For the reasons set forth hereafter, this Court holds that, at least until Hopewell desists from conduct that is in contempt of the appropriate jurisdiction of this Court, the 1999 Order, issued by this Court, should not be enforceable.

### A. Background

The background to the instant proceedings is set forth fully in the opinion of Chief Judge Tina L. Brozman of this Court granting the 1999 Order. *See In re Petition of the Board of Directors of Hopewell International Insurance Ltd.*, 238 B.R. 25 (Bankr.S.D.N.Y.1999). In brief, Hopewell provided reinsurance to captive insurance companies and retained for itself a fraction of the risk, reinsuring the remainder with other insurers or reinsurers called retrocessionaires. The retrocessionaires not

---

**1.** A captive insurance company is owned by and run for the benefit of an operating company. Generally, the captive has few assets and employees and is reinsured.

only shared in Hopewell's contractual liability to the captives; apparently, they are also its shareholders, are represented on or control its Board, and are entitled to any surplus from its insolvency proceedings once all creditor claims are paid. Hopewell's contract with Gold Medal, one of the captive insurers that bought reinsurance, provided that coverage disputes would be arbitrated under Minnesota law, where Gold Medal is located. Hopewell's Scheme of Arrangement, however, provided that coverage disputes would be uniformly arbitrated in Bermuda under Bermuda law.

By 1995 General Mills had submitted a formal claim against Gold Medal in the sum of $219 million in connection with a costly pesticide incident. Gold Medal had denied coverage and proceedings had commenced in Minnesota (under which General Mills would eventually obtain a judgment of $203.5 million against Gold Medal). When it came time to hold Hopewell's final meeting of creditors to consider sanctioning its Scheme, in June 1995, Gold Medal's claim was unresolved, and it was given a nominal claim for voting purposes. Gold Medal's representative voted in favor of the Scheme, and the Scheme was approved by the unanimous vote of Hopewell's other creditors. *In re Hopewell,* 238 B.R. at 41 and 56. On June 29, 1995, a hearing was held in Bermuda to sanction the Scheme, there were no objections, and an order was entered by the Bermuda Court on June 29, 1995 formally sanctioning the Scheme.

In June 1995 Gold Medal had reason to believe that notwithstanding the provisions of the Scheme relating to arbitration under the governing law of Bermuda, which is comparable to English law, the results of the ongoing Minnesota proceedings would not be reconsidered on the merits. As a consequence of an intervening decision in England, however, Hopewell took the position that it was not bound by the Minnesota proceedings. Gold Medal thereupon threatened to ignore the Scheme and attempt to collect its claims directly against Hopewell's retrocessionaires in the United States. Hopewell's response was two-fold. First, it obtained an *ex parte* injunction from the Bermuda court (the "1998 Bermuda Injunction") which restrained Gold Medal from violating the Scheme.[2] Second, Hopewell brought the instant proceeding under § 304 of the Bankruptcy Code to enforce, in the United States, the 1998 Bermuda Injunction and the Scheme of Arrangement itself.

After eight days of trial, Chief Judge Brozman, in a 78–page decision, granted Hopewell's § 304 application. After determining that venue was proper in New York and that the Board of Directors of Hopewell had standing to commence the proceeding as a "foreign representative," she found that the factors that govern the discretion of a bankruptcy court in a § 304 case were fully satisfied. She ruled that the provisions of the Scheme were fundamentally fair and entitled to comity in the United States and that, in addition, Gold Medal had been aware of them, had not objected to them, and had in fact voted in favor of the Scheme. Emphasizing that the Scheme proposed to pay all creditors in full, she concluded that the requirement that Gold Medal arbitrate its claim in Bermuda under Bermuda law was not so prejudicial as to permit the courts in the Unit-

---

**2.** The 1998 Bermuda Injunction also provided that Gold Medal was at liberty to apply to the Bermuda Court "to vary or discharge this Order, or to seek directions with regard thereto or with regard to the aforesaid Scheme of Arrangement...". This is, of course, a standard clause in injunctions that was also included in different form in the 1999 Order of this Court.

ed States to refuse to give effect to the Scheme. This Court held:

"Bankruptcy sometimes causes changes in contractual rights necessary to benefit the estate as a whole... Hopewell advanced good and sufficient reasons why arbitration in one jurisdiction under one country's law would aid in carrying out its scheme. I cannot say that the Bermuda court's acceptance of these reasons (as evidenced by its issuance of the injunction against Gold Medal as well as its sanctioning of the uncontested scheme) was either capricious or violative of some fundamental U.S. public policy." 238 B.R. at 63.

Based on this Court's conclusion that the Scheme as a whole was entitled to recognition under § 304, the Court thereupon entered the 1999 Order, giving full force and effect to the Scheme of Arrangement in the United States and enjoining Gold Medal and all other creditors from acting in contravention to the Scheme, "including but not limited to the commencement or continuation of any action in furtherance of a Scheme Claim, and any action against the Company [Hopewell], or its property in the United States, or the Petitioner [Board of Directors of Hopewell] ...". (1999 Order at 3.) The Order issued by Judge Brozman also contained a clause reserving jurisdiction to modify or amend the Order. This clause, which is central to the instant proceedings, provides as follows:

"This Court shall retain jurisdiction with respect to the enforcement, amendment or modification of this Order, and requests for any additional relief in this § 304 case and all adversary proceedings in connection therewith properly

commenced and within the jurisdiction of this Court."

Gold Medal filed a notice of appeal from the 1999 Order, and the appeal remains pending in the District Court. Gold Medal did not obtain a stay, however, and it participated in an arbitration that commenced in Bermuda in June 2000 to establish its claim. The Scheme contained a clause that provided for a final meeting of creditors to take place no later than June 30, 2001 and for a final distribution to creditors to be made as soon thereafter as practicable. Over Gold Medal's objection, Hopewell apparently obtained an order from the Bermuda court that confirmed a clause in the Scheme providing that if Gold Medal's claim had not been liquidated by June 30, 2001, Hopewell could distribute its assets and Gold Medal would forfeit any claim against Hopewell and would instead be entitled only to an assignment of Hopewell's rights against the retrocessionaires. The parties hotly dispute responsibility for the fact that Gold Medal's claim was not liquidated by June 30, 2001, but Gold Medal does not appear to dispute that it has now lost any right to recover, under the Scheme, against Hopewell for Hopewell's retained liability. There also appears to be little dispute that Hopewell's assets, after payment in full to all of its creditors other than Gold Medal, have been distributed to its shareholders or placed in escrow for their benefit, and that the conclusion of the arbitration is not in sight.[3]

On November 9, 2001, Gold Medal submitted a motion (the "Motion") to this Court for modification of the 1999 Order under Federal Rule of Civil Procedure 60(b), made generally applicable in bank-

---

3. The record is not clear whether the distribution to shareholders has already been made or whether the surplus funds, after payment of all liquidated claims, are still being held by Hopewell. Hopewell told the Court in Bermuda at a hearing on November 23, 2001, that the distribution to shareholders has not yet been made.

ruptcy cases by Bankruptcy Rule 9024. Gold Medal argued that in the three years since the entry of the 1999 Order, circumstances had changed which make it unfair to require Gold Medal to be bound by Hopewell's Scheme of Arrangement. First, Gold Medal alleged that the Scheme has largely been carried out and creditors have been paid, thereby eliminating the risk of piecemeal distribution, prejudice to other creditors, and the need to continue this Court's 1999 Order in effect. Second, Gold Medal contended that it was being unfairly prejudiced by the 1999 Order in that its liability and its corresponding claim against Hopewell had been finally determined in 2000 by the Minnesota courts (at an expense to Gold Medal of more than $3 million). It claimed that it should be free to proceed directly against the retrocessionaires located in the United States to collect their share of the liability, and that this would have no effect on the Hopewell Scheme as Gold Medal would be unable, in any event, to collect anything directly from Hopewell. Gold Medal further argued that the delay as a result of arbitration proceedings in Bermuda was causing it irreparable harm, that several retrocessionaires had already become insolvent and that by 2003 other insolvent retrocessionaires would be unable to pay their portion of a liability they shared on a several, but not joint basis. During the course of the arbitration, Gold Medal claimed, it had lost the right to recover over $20 million due to the Hopewell Scheme and the insolvency of several of the retrocessionaires.[4]

Gold Medal filed the Motion, joined in by General Mills, on or about November 9, 2001, with a return date of November 19, 2001, which was later adjourned by consent to December 19, 2001. Before the hearing date, however, and without submitting any response on the merits, Hopewell appeared before the Supreme Court of Bermuda on November 23, 2001, and obtained an order as follows:

> "That Gold Medal Insurance Company be restrained and an Injunction is hereby granted restraining it whether by itself its officers, directors, shareholders, servants or agents or otherwise howsoever, be restrained until further order from taking any step in the proceedings before a United States Bankruptcy Court for the Southern District of New York, captioned 'In Re: Petition of the Board of Directors of Hopewell International Insurance Ltd., As Scheme Administrators of Hopewell International Insurance Ltd.' Case No.: 98–B–45440 (ALG), seeking to vary or discharge the permanent injunction granted by the said United States Bankruptcy Court on 21 September 1999."

This order (the "2001 Injunction") further restated the 1998 Bermuda Injunction and ordered Gold Medal to pay Hopewell's costs as allowed under Bermuda law.[5]

In response to the entry of the 2001 Injunction, Gold Medal requested a chambers conference before this Court. At this conference, and subsequently by order, the parties were requested to each file a statement as to how they believed this Court

---

4. It appears that some retrocessionaires have also raised an issue under Bermuda law as to whether the assignment of rights is valid and have demanded arbitration of that issue. If the assignment is not valid, Gold Medal may be left with nothing except a large claim by Hopewell for the costs of all of the proceedings. Hopewell contends that the arbitration

can conclude before 2003 and that Gold Medal has a valid assignment of its rights against the retrocessionaires.

5. It appears that Hopewell gave Gold Medal's Bermuda counsel, in the week of the U.S. Thanksgiving holiday, two days' notice of the proceedings. Gold Medal did not appear.

should proceed in light of the 2001 Injunction issued by the Bermuda Supreme Court. The Court has received submissions from the parties, as well as Hopewell's substantive response to Gold Medal's Motion to modify the 1999 Order.[6] Although Hopewell provided that response on the merits, its position is that the 2001 Bermuda Injunction is appropriate and binding, that Gold Medal cannot proceed any further in this Court without being in contempt of the Bermuda Injunction, and that this Court should "grant comity" to the 2001 Injunction, issued by the Court where the main proceeding is pending.

*B. Jurisdiction of this Court to Hear this Matter*

■■■ As a preliminary matter, this Court must consider its jurisdiction to hear any aspect of this matter notwithstanding that the 1999 Order is on appeal. On this point, this Court has the authority to entertain Gold Medal's Rule 60(b) motion and consider appropriate relief even though the 1999 Order has been appealed to the District Court. *Fort Knox Music Inc. v. Baptiste*, 257 F.3d 108, 111 (2d Cir.2001); *Ryan v. United States Lines Co.*, 303 F.2d 430, 433–34 (2d Cir.1962); 11 CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE: CIVIL 2D § 2873. As the Second Circuit first held in *Ryan*, in the interest of judicial economy, it is appropriate that a lower court have the limited power to consider a motion to vacate or modify its order without first requiring a remand from the appellate court. By analogy, this Court has power to consider appropriate relief on the issue before it in light of the present circumstances.

In *Ryan* the Second Circuit set forth the proper procedure for a lower court to use in connection with a request for modification of an order on appeal. "The [lower] court is first to determine whether it would grant the motion; if it decides in favor of it, then and only then is the necessary remand by the court of appeals to be sought." *Id.* at 434. The Second Circuit has affirmed the use of this procedure many times. *Fort Knox*, 257 F.3d at 111; *U.S. v. Moore*, 182 F.3d 902, 902 (2d Cir.1999); *Toliver v. Sullivan*, 957 F.2d 47, 49 (2d Cir.1992); *Fidenas AG v. Compagnie Internationale Pour L'Informatique Cii Honeywell Bull S.A.*, 606 F.2d 5, 6 & n. 1 (2d Cir.1979).

In this very case, it also appears that Gold Medal already has sought and obtained permission from the District Court for this Court to consider Rule 60(b) relief. The parties appeared before Judge Chin of the District Court on December 20, 2000, and during that appearance Gold Medal requested that the case be remanded so that the Bankruptcy Court could reconsider the 1999 Order. (Tr. of District Court Hearing of 12/20/00 at 47.) While Judge Chin expressed the view that a formal remand was not necessary, he did give permission for the parties to return to this

---

6. On the merits Hopewell contended that circumstances have not changed and Judge Brozman's ruling that Gold Medal had lost its contractual right to arbitrate in Minnesota when the Scheme of Arrangement was sanctioned should remain in effect and not be relitigated. In any event, Hopewell asserted that there had not been a change of circumstances or extraordinary hardship which would justify a modification of the 1999 Order under Rule 60(b). Hopewell also responded to Gold Medal's request for a reconsideration of the factors under § 304(c) to determine whether the Hopewell Scheme is still entitled to recognition here by arguing that (1) these arguments had already been ruled upon by this Court, (2) Gold Medal was not intentionally subordinated in the Scheme, and (3) Gold Medal voted in favor of the Scheme and, therefore, is bound by its provisions.

Court to hear a Rule 60(b) motion. "If there are changed circumstances, it seems to me those changes ought to be brought to the attention of the bankruptcy court in the first instance, and then there could be an appeal. It seems to me it is not for me to create a record." (Tr. 12/20/00 at 48.) Given that the appellate court has consented to this Court's considering a Rule 60(b) motion, and that Hopewell has not opposed the motion on the ground that an appeal is pending, there is no reason to delay by seeking leave from the District Court before following the *Ryan* procedures and recommending the relief provided for herein.[7]

## C. The Conflict Created by the Bermuda 2001 Injunction.

As evidenced by the decision of the former Chief Judge of this Court in this very case, the courts of this country have been highly receptive to the recognition and enforcement of foreign insolvency proceedings. *See e.g., In re Hopewell,* 238 B.R. at 66; *Maxwell Communication Corp. v. Societe Generale (In re Maxwell Communication Corp.),* 93 F.3d 1036, 1048 (2d Cir. 1996); *Cunard Steamship Co. Ltd. v. Salen Reefer Servs. AB,* 773 F.2d 452, 460 (2d Cir.1985); *In re Petition of the Board of Directors of Compania General de Combustibles,* 269 B.R. 104, 112 (Bankr. S.D.N.Y.2001); *In re Petition of Davis,* 191 B.R. 577, 587 (Bankr.S.D.N.Y.1996);

*In re Axona Intern. Credit & Commerce Ltd.,* 88 B.R. 597, 607 (Bankr.S.D.N.Y. 1988), *aff'd,* 115 B.R. 442 (S.D.N.Y.1990), *appeal dism.,* 924 F.2d 31 (2d Cir.1991). Prior to the adoption of the Bankruptcy Reform Act of 1978, 11 U.S.C. § 101 et seq. (the "Bankruptcy Code"), there was relatively little coordination of international insolvency proceedings, and plenary proceedings in multiple jurisdictions were often necessary.[8] As a result of several major cross-border insolvencies, Congress adopted § 304 of the Bankruptcy Code, which contemplates an ancillary proceeding in this country in aid of a principal foreign case. *See Goerg v. Parungao (In re Goerg),* 844 F.2d 1562, 1567 (11th Cir. 1988); *In re Axona Intern.,* 88 B.R. at 604; *Universal Casualty & Surety Co. v. Gee,* 53 B.R. 891, 896 (Bankr.S.D.N.Y.1985) ("Congress provided a mechanism for the courts in this country to aid foreign courts and accommodate the increasing number of foreign insolvency cases."); Stuart A. Krause, *et. al., Relief Under Section 304 of the Bankruptcy Code: Clarifying the Principal Rule of Comity in Transnational Insolvencies,* 64 FORDHAM L. REV. 2591, 2593 (1996).

The U.S. Court may in a § 304 proceeding grant broad relief, including an injunction against the commencement or the continuation of an action against the foreign debtor's property and turnover of such property to the foreign representa-

---

7. Indeed, representations were made by counsel for Hopewell that it would not oppose a Rule 60(b) motion in the bankruptcy court on procedural grounds, as follows:

THE COURT: Basically on what you have said, I don't think that there is any need for a remand because you would not oppose procedurally the filing of such application ...am I hearing you correctly?

MR. SEIFE (U.S. Counsel for Hopewell): Yes, your Honor. (Tr. 12/20/01 at 48.)

8. *See* Burman, Harold S., *Harmonization of International Bankruptcy Law: A United States Perspective,* 64 FORDHAM L.R. 2543, 2553–4 (1996). Plenary proceedings are still permissible. Section 303 of the Bankruptcy Code permits a foreign representative to commence a full involuntary proceeding against an entity entitled to commence a case in this country. Section 305 also gives the court authority to dismiss, abstain in or suspend proceedings in a case at the behest of a foreign representative. *See In re Axona Intern.,* 88 B.R. at 607.

tive. 11 U.S.C. § 304(b)(1) & (2); *Koreag, Controle et Revision S.A. v. Refco Assoc. Inc. (In re Koreag)*, 961 F.2d 341, 348 (2d Cir.1992). "If any philosophy can be attributed to the structure of the Code it is that of deference to the country where the primary insolvency proceeding is located...and flexible administration of assets." *Hopewell*, 238 B.R. at 54 (quoting *Hong Kong and Shanghai Banking Corp, Ltd. v. Simon (In re Simon)*, 153 F.3d 991, 998 (9th Cir.1998), *cert. denied*, 525 U.S. 1141, 119 S.Ct. 1032, 143 L.Ed.2d 41 (1999)); *see also, Remington Rand Corp.-Delaware v. Business Systems Inc.*, 830 F.2d 1260, 1271 (3rd Cir.1987); *A.P. Esteve Sales v. Manning (In re Manning)*, 236 B.R. 14, 21 (9th Cir. BAP 1999); *In re Culmer*, 25 B.R. 621, 624 (Bankr.S.D.N.Y. 1982).

 Section 304 contains no reciprocity requirement, and U.S. courts enforced foreign decrees at a time when the courts of other nations refused to do so.[9] Cooperation in international insolvencies gained momentum when, in 1997, the United Nations Commission on International Trade Law (UNCITRAL) approved a Model Law on Cross Border Insolvency and recommended it to member nations for adoption. U.N. COMM'N ON INT'L TRADE LAW, MODEL LAW ON CROSS-BORDER INSOLVENCY WITH GUIDE TO ENACTMENT, U.N. Sales No. E. 99 V. 3, UNITED NATIONS COMMISSION ON INTERNATIONAL TRADE LAW, 30th Sess., at 3, U.N. Doc. A/CN. 9/442 (1997), *reprinted in* 6 TUL. J. INT'L & COMP. L. 415, 439 (1998); *see* Jay Lawrence Westbrook, *Modeling International Bankruptcy*, 1998–1999 ANN. SURV. OF BANKR. L. 465. Similar to § 304, the Model Law contemplates the existence of a main proceeding and a "non-main

proceeding," with the estate representative in the main proceeding authorized to seek relief in an ancillary proceeding before the courts of another nation, including enforcement of its orders and decrees. It is a given, therefore, that not only is the Court bound by United States law to carry out to full effect the principles underlying § 304, but that such principles have played an important role in rationalizing a significant area of international law. *See* Jay Lawrence Westbrook, *A Global Solution to Multinational Default*, 98 MICH. L. REV. 2276, 2300–2301 (2000); Krause, *supra*, 64 FORDHAM L. REV. at 2594; Melissa S. Rimel, *American Recognition of International Insolvency Proceedings: Deciphering Section 304(c)*, 9 BANKR. DEV. J. 453, 456 (1992).

 Notwithstanding the foregoing, neither § 304 nor the Model Law provides for automatic recognition of a foreign insolvency case. *See Bank of New York v. Treco (In re Treco)*, 240 F.3d 148, 154 (2d Cir.2001); *In re Banco Nacional de Obras y Servicios Publicos, S.N.C.*, 91 B.R. 661, 664 (Bankr.S.D.N.Y.1988); *In re YMB Magnex International, Inc.*, 249 B.R. 402, 407 (Bankr.E.D.Pa.2000). "To grant relief under § 304 this Court must first consider the six factors set forth in § 304(c)." *Vesta Fire Ins. Corp. v. New Cap Reinsurance Corp.*, 244 B.R. 209, 214 (S.D.N.Y. 2000), *aff'd*, 238 F.3d 186 (2d Cir.2001). The factors in § 304(c) include whether such relief is consistent with the following: "(1) just treatment of all holders of claims against or interests in such estate; (2) protection of claim holders in the United States against prejudice and inconvenience in the procession of claims in such foreign proceeding; (3) prevention of preferential

---

9. *See, e.g., Felixstowe Dock & Railway Co. v. U.S. Lines Inc.*, 1987 Q.B. 360, 389, 1987 WL 492150 (Q.B.1987) where the English Court (the Queen's Bench Division) refused comity

to a Chapter 11 case pending in the United States, noting that the courts of France, Netherlands and other countries would also not suspend their separate proceedings.

or fraudulent dispositions of property of such estate; (4) distribution of proceeds of such estate substantially in accordance with the order" of distribution in the Bankruptcy Code; and (5) "comity."[10] 11 U.S.C. § 304(c). Chief Judge Brozman applied the § 304 factors when she issued her decision and the 1999 Order determining that the Scheme was entitled to enforcement in this country. *In re Hopewell,* 238 B.R. at 55.

Hopewell's argument in support of the 2001 Injunction issued by the Bermuda court rests in large part on the contention that the Bermuda proceeding, as the "main proceeding," is entitled to priority and that the Bermuda Court can appropriately enjoin Hopewell's creditors from attempting to subvert a sanctioned Scheme. It contends that the 2001 Injunction issued by the Bermuda Supreme Court does not have any greater effect than that Court's 1998 Injunction, when Gold Medal was enjoined from taking action in derogation of the Hopewell Scheme, and that injunctions issued by U.S. bankruptcy courts at the time of confirmation of a plan of reorganization or the issuance of a discharge order are commonplace.[11]

As Chief Judge Brozman noted in this very case, however, an order entered at the conclusion of an insolvency proceeding is not self-executing in other jurisdictions. *In re Hopewell,* 238 B.R. at 54–55. To obtain an order in the United States enforcing the 1998 Bermuda Injunction and the Scheme of Arrangement, Hopewell was required to satisfy the provisions of § 304 and demonstrate that the Scheme was entitled to enforcement here. It obtained an order of enforcement, but that order expressly reserved the jurisdiction of this court to modify or amend it. Hopewell cannot pretend that it is entitled to all of the benefits of the 1999 Order of this Court while ignoring the reservation of jurisdiction to amend or modify the Order. *See In re Laitasalo,* 196 B.R. 913, 925 (Bankr.S.D.N.Y.1996).[12]

---

**10.** The fifth factor, comity, weighs very heavily in the balance and while "it does not automatically override the other factors..." many courts have agreed that comity "is the ultimate consideration in whether to grant relief under § 304." *In re Treco,* 240 F.3d at 156–157; *In re Koreag, Controle,* 130 B.R. at 712; *In re Axona Intern.,* 88 B.R. at 609. Indeed, the courts of this Circuit have granted comity to foreign insolvency cases even in the absence of a request for relief under § 304. *See Cunard,* 773 F.2d at 461 (holding that although the better practice may be for the foreign entity to seek a § 304 order, it would, nevertheless, enforce a Swedish liquidation proceeding and vacate an attachment that had been obtained in the U.S. in derogation thereof).

**11.** It is routine for a bankruptcy court at the conclusion of a bankruptcy case to enjoin creditors from acting in derogation of the order concluding the case. The Bankruptcy Code provides that in a Chapter 11 case "the provisions of a confirmed plan bind" all entities, whether or not they have accepted the plan, 11 U.S.C. § 1141(a), and the Court may direct parties to perform any act necessary to consummate the plan. 11 U.S.C. § 1142(b). On entry of a discharge in a Chapter 7 case, the court also routinely enters an order enjoining all entities from collecting a money judgment from the debtor based on any discharged debt. *See In re Maxwell,* 93 F.3d at 1048; *Sure–Snap Corp. v. State Street Bank & Trust Co.,* 948 F.2d 869, 873 (2d Cir.1991); *In re Hopewell,* 238 B.R. at 68.

**12.** The *Laitasalo* court explained: "Congress intended that debtors in foreign proceedings be bound by bilateral orders entered on their consent and orders flowing from those agreements," citing *inter alia,* § 306 of the Bankruptcy Code, which gives a foreign representative the privilege of making a limited appearance in this nation's courts to seek relief but specifically provides that the "bankruptcy court may condition any order under section 303, 304, or 305 of this title on compliance by such foreign representative with the orders of such bankruptcy court."

Even if there were no express reservation of jurisdiction in the 1999 Order, a court's power to alter or amend its own order is provided for under F.R. Civ. P. 60, made applicable in bankruptcy cases by Bankruptcy Rule 9024 (with exceptions not relevant here). *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 863, 108 S.Ct. 2194, 100 L.Ed.2d 855 (1988); *Altman v. Connally*, 456 F.2d 1114, 1116 (2d Cir.1972); *see Ryan*, 303 F.2d at 434. It is inherent in the jurisdiction of any court, and it cannot be infringed upon by another tribunal. "Where the jurisdiction of a court, and the right of a plaintiff to prosecute his suit in it, have once attached, that right cannot be arrested or taken away by proceedings in another court." *Peck v. Jenness*, 48 U.S. 612, 625, 7 How. 612, 12 L.Ed. 841 (1849); *see also, Compagnie des Bauxites de Guinea v. Insurance Co.*, 651 F.2d 877, 887 (3d Cir.1981). It has expressly been held in a § 304 case that it is a court's duty to consider new developments, *In re Empresa de Transportes Aero del Peru, S.A.*, 263 B.R. 367, 377 (S.D.Fla.2001) (subject matter jurisdiction); and that "it may be necessary after a § 304 case is filed and relief granted to tinker with that relief to do justice in particular circumstances." *In re Banco Nacional*, 91 B.R. at 664 (Brozman, J.).[13]

Hopewell's reliance on *Hong Kong and Shanghai Banking Corp. v. Simon (In re Simon)*, 153 F.3d 991 (9th Cir.1998), *cert. denied*, 525 U.S. 1141, 119 S.Ct. 1032, 143 L.Ed.2d 41 (1999), is misplaced. *Simon* affirmed a U.S. court's injunction against a creditor that had filed a proof of claim and participated fully in a U.S. case from attempting to collect in Hong Kong on a debt that had been discharged by the American proceeding. Noting that there was no competing bankruptcy case in Hong Kong, the Ninth Circuit found that there was no "true conflict" with any other case and that the U.S. court, having jurisdiction over the debtor and the creditor, properly enjoined the creditor from bringing suit against the debtor, even though such suit would have been filed outside of the United States. 153 F.3d at 999. The order in *Simon*, in fact, resembles the 1998 Injunction entered by the Bermuda court, the propriety of which is not in question.[14]

By contrast the 2001 Injunction is not an order that simply enjoins Gold Medal from violating the Scheme, as did the 1998 Injunction entered by the Bermuda court. The 2001 Injunction provides that Gold Medal and its agents are enjoined from taking action in this Court that is specifically permitted under the terms of the 1999 Order. The 2001 Injunction, therefore, directly prohibits Gold Medal from doing what it is authorized to do under the

---

**13.** Article 18 of the Model Law similarly requires the foreign representative to inform a court in which recognition of a main proceeding has been obtained of "subsequent information," and the law provides for "modification or termination of recognition if it is shown that the grounds for granting it....have ceased to exist." Model Law § 17(4).

**14.** In *Lernout & Hauspie Speech Products, N.V. v. Stonington Partners, Inc. (In re Lernout & Hauspie Speech Products N.V.)*, 268 B.R. 395 (D.Del.2001), the District Court affirmed on expedited appeal an order of the Bankruptcy Court that, among other things, refused to extend comity to a parallel plenary insolvency proceeding in Belgium and enjoined creditors that had appeared before the U.S. court from taking certain action in the Belgian proceeding. That order more closely resembles the 1998 Bermuda Injunction than the order at issue here, and thus there is no need to consider whether it was properly entered, notwithstanding the pending parallel proceeding in Belgium. The District Court itself expressed doubt as to whether the entry of an injunction against the creditors was sufficiently justified. 268 B.R. at 404, n. 1.

1999 Order, and it offends this Court's inherent jurisdiction to determine the nature, extent and duration of the relief available to Hopewell in the United States. For the first time it creates a "true conflict" between the Bermuda Court and this Court. *In re Maxwell*, 93 F.3d at 1048. It is no answer that the 2001 Injunction enjoins only Gold Medal and its agents and not this Court itself. "The fact that the injunction operates only against the parties, and not directly against the foreign court, does not eliminate the need for due regard to the principles of international comity, because such an order effectively restricts the jurisdiction of the court of a foreign sovereign." *China Trade & Dev. Corp. v. M.V. Choong Yong*, 837 F.2d 33, 35 (2d Cir.1987); citing *Peck v. Jenness*, 48 U.S. at 625, 12 L.Ed. 841, and *U.S. v. Davis*, 767 F.2d 1025, 1038 (2d Cir.1985). Once Hopewell brought an ancillary proceeding in the courts of this country to enforce the 1998 Injunction, and obtained an order of enforcement on condition that any entity could move to modify or amend that order, it lost the right to return to Bermuda and obtain an injunction enforceable in this country that would forbid a entity from making just such a motion.

In *Underwood v. Hilliard (In re Rimsat, Ltd.)*, 98 F.3d 956 (7th Cir.1996), the Seventh Circuit was faced with the need to reconcile competing insolvency proceedings, one in the United States and one in Nevis. The Court held that the Bankruptcy Code does not require the U.S. court to abstain in or suspend a proceeding here merely because a foreign proceeding is pending. The *Rimsat* Court then added, in words that are apt, "[b]ut even more clearly it does not require the bankruptcy court to abstain on the basis of a proceed-

ing instituted after, and in an effort to defeat, the [U.S.] bankruptcy proceeding—— strategic conduct that is not to be encouraged." 98 F.3d at 962. As the Court continued, "Comity is a doctrine of adjustment, not a mandate for inaction. In the case of parallel inconsistent proceedings in domestic and foreign courts, one must yield; there is no presumption that it is the domestic; and the bankruptcy judge did not abuse his discretion in deciding that the receivership proceeding in Nevis should be the one." *Id.* at 963.[15]

In the unusual circumstances here, the U.S. proceeding should not yield despite its status as the ancillary or "non-main" case. *Rimsat* relied on established jurisprudence that attempts to resolve disputes where proceedings between private litigants are pending in two jurisdictions. 98 F.3d at 964. In private litigation, U.S. courts generally permit both such proceedings to go forward and grant comity to the first that results in a final judgment entitled to *res judicata* treatment. *Princess Lida v. Thompson*, 305 U.S. 456, 466, 59 S.Ct. 275, 83 L.Ed. 285 (1939); *Laker Airways Ltd. v. Sabena, Belgian World Airlines*, 731 F.2d 909, 926–27 (D.C.Cir.1984) (citing *Colorado River Water Conservation District v. United States*, 424 U.S. 800, 817, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976)). The Second Circuit has been particularly reluctant to allow the courts of this country to issue anti-suit injunctions against foreign proceedings, holding that such remedies should be " 'used sparingly,' " and "should be granted 'only with care and great restraint.' " *See China Trade*, 837 F.2d at 36, quoting *United States v. Davis*, 767 F.2d at 1038, and *Canadian Filters (Harwich) v. Lear–Siegler*, 412 F.2d 577,

---

**15.** Based on different facts, the American proceedings were required to abstain in favor of proceedings in the Bahamas in *In re Commo-* *dore International Ltd.*, 262 F.3d 96 (2d. Cir. 2001).

578 (1st Cir.1969).[16] But this Circuit, like others that have reached the issue, holds that a U.S. court should act "in order to protect its own jurisdiction." *China Trade*, 837 F.2d at 37 (citing *Laker Airways*, 731 F.2d at 917–21); *see also Computer Associates Intern. Inc. v. Altai Inc.*, 126 F.3d 365, 372 (2d Cir.1997). As the court in *Laker* explained, "Where the foreign proceeding is not following a parallel track but attempts to carve out exclusive jurisdiction over concurrent actions, an injunction may be necessary to avoid the possibility of losing validly invoked jurisdiction." *Laker Airways*, 731 F.2d at 930.

The 2001 Injunction explicitly attempts to "carve out exclusive jurisdiction" over a matter where this Court's 1999 Order, in accord with established law, reserved its own jurisdiction,— jurisdiction that had been initially, and validly, invoked by Hopewell itself. It is not justified by the fact that Bermuda is the situs of the main proceeding because Bermuda plainly does not have exclusive jurisdiction.[17]

Hopewell relies on the very recent English decision in *Turner v. Grovit*, [2001] UKHL 65, 2001 WL 1479757(HL) (2001), in which the House of Lords affirmed an anti-suit injunction preventing a U.K. company from maintaining an action in a forum found improper on *forum non conveniens* grounds. The question there was whether it was appropriate to restrain proceedings in light of the Brussels Convention on Jurisdiction and the Enforcement of Judgments in Civil and Commercial Matters, and the court referred the case to the European Court of Justice. In any event, there appears to be ample authority in England that an anti-suit injunction should not be granted under the present circumstances. In the insolvency proceedings involving Maxwell Communications Corporation, parallel plenary insolvency cases were brought in both the United Kingdom and the United States. When the English administrators of the company, acting in the U.S. case, sought to sue a British bank to avoid a transaction that was arguably a preference under U.S. law but likely immune in the U.K., the bank asked the English court to enjoin their

---

**16.** Cases in the Third, Sixth and D.C. Circuits, similarly urge great restraint in the issuance of a foreign suit injunction. *General Electric Company v. Deutz A.G.*, 270 F.3d 144, 161 (3d Cir.2001); *Gau Shan Co. v. Bankers Trust Co.*, 956 F.2d 1349, 1355–1357 (6th Cir.1992); *Laker Airways*, 731 F.2d at 928. The Fifth, Seventh, and Ninth Circuits are generally more liberal. *Kaepa Inc. v. Achilles Corp.*, 76 F.3d 624, 626–628 (5th Cir.1996); *Allendale Mut. Ins. Co. v. Bull Data Sys. Inc.*, 10 F.3d 425, 431–432 (7th Cir.1993); *Seattle Totems Hockey Club Inc. v. National Hockey League*, 652 F.2d 852, 855 (9th Cir.1981).

**17.** The transcript of the hearing before the Bermuda Supreme Court, in which Hopewell sought and obtained the 2001 Injunction in Gold Medal's absence, reveals that Hopewell argued that the Bermuda court had exclusive jurisdiction over the matter. First, counsel failed to call to the attention of the Bermuda court the fact that the 1999 Order reserved jurisdiction in the American court to modify or amend the order, which is what Gold Medal was to be enjoined from doing. Then, when the Bermuda court inquired, "Would it be appropriate that I should make an order that this court accepts that it has exclusive jurisdiction," counsel replied only, "Well my Lady there is no harm in saying that but I submit it is not necessary to make that finding." When the Court then said, "I think that is established," counsel affirmatively misstated, "It is established. It's established in Bermuda and New York." (Verbatim Record of the *Ex Parte* Hearing, on 23 November 2001, before Justice Wade–Miller for the grant of an anti-suit injunction against Gold Medal Insurance Company, pp. 13–14.) Counsel for Hopewell also failed to inform the Court in Bermuda that co-counsel in the United States had told District Judge Chin that counsel would not oppose on procedural grounds a Rule 60(b) motion being brought in this Court.

countrymen from suing it in the U.S. and asserted the primacy of U.K. law. *In re Maxwell Communication Corp.*, 170 B.R. 800, 804–805 (Bankr.S.D.N.Y.1994).[18] Although a High Court judge had first granted an interim injunction, that would forbid the administrators from suing in the United States, it was thereafter vacated with the following statement from the Court:

"The normal assumption is that the foreign judge is the best person to decide whether an action in his own court should proceed... It seems to me, therefore, that an injunction (were I otherwise disposed to grant it) could serve no purpose except to antagonize the U.S. court and prejudice the cooperation which has thus far prevailed between the chapter 11 and the English administration. If the U.S. judge does not think that there is a sufficient connection with America to justify a preference action against [the English bank], she will dismiss [the] suit."

As Justice (now Lord) Hoffmann said, an injunction that prohibits a party from taking lawful action in a foreign proceeding is antithetical to the principles of comity that require courts to cooperate and respect their appropriate jurisdiction, where no one court has exclusive jurisdiction over a matter. The English Court of Appeal dismissed the British bank's appeal from this order, and the bank's request for leave to appeal to the House of Lords was denied. 170 B.R. at 805.

Nothing said above implies that Gold Medal would not have a very heavy burden to demonstrate that the 1999 Order should be vacated or amended.[19] This Court has already found that the 1998 Injunction and the Scheme of Arrangement are entitled to enforcement in the United States, and the orders of the Bermuda Court are, under established principles of comity and as recognized by § 304, entitled to great weight. *In re Treco*, 240 F.3d at 157 ("We expect that the case-specific analysis required by § 304 will in most cases support the granting of relief."); *In re Compañia General de Combustibles*, 269 B.R. at 111–113. On the other hand, there is no place in international insolvency proceedings, or in this case, for the type of anti-suit injunction that Hopewell obtained in Bermuda.[20]

### D. Appropriate Relief

 The final issue is the relief that should be granted. This should be determined in light of the powers available under § 304, as well as those available to any court when responding to an anti-suit injunction. The court in a § 304 proceeding is "free to mold appropriate relief in near blank check fashion," *In re Banco Nacion-*

---

**18.** The description of the English proceedings is set forth in the opinion of Judge Brozman of this Court at 170 B.R. 800, 804–805 (Bankr.S.D.N.Y.), *affd*, 186 B.R. 807 (S.D.N.Y.), *affd*, 93 F.3d 1036, (2d Cir.1996).

**19.** Although nothing herein is intended to indicate any view of the merits of Gold Medal's motion, Gold Medal has gained the right to be heard. As noted above, it weighed heavily in Judge Brozman's opinion that the Hopewell Scheme proposed to pay in full all of its creditors. Hopewell's Scheme has instead effectuated payment to all creditors other than Gold Medal and now proposes a distribution to shareholders without any distribution on

Gold Medal's claim. This Court expresses no view as to whether this amounts to that type of extraordinary maladministration of a foreign bankruptcy that would justify denial of § 304 relief or an amendment to a two-year-old order. *See generally, In re Treco*, 240 F.3d at 163; *In re Compañia General de Combustibles*, 269 B.R. at 111–113.

**20.** Because of the nature of the injunction entered in Bermuda, and the circumstances here, there is no merit to Hopewell's contention that Gold Medal waived its rights by not contesting the 2001 Injunction in Bermuda. *See Y.M.B. Magnex*, 249 B.R. at 409–410.

*al,* 91 B.R. at 664; *In re Culmer* 25 B.R. at 624; *In re Petition of Bird,* 222 B.R. 229, 234 (Bankr.S.D.N.Y.1998). Similarly, a court can exercise its discretion in determining appropriate relief in response to an anti-suit injunction such as that entered in Bermuda. *Laker Airways,* 731 F.2d at 943–944.

■ When one court enters an anti-suit injunction that offends the jurisdiction of another court, one form of relief is for the offended court to issue a counter-injunction. *Laker Airways,* 731 F.2d at 927. Such circular action would be inherently absurd in this case. A counter-injunction would provide the parties with no remedy since they could each be liable for contempt in one court for appearing in the other. *See Laker Airways,* 731 F.2d at 927, where the Court stated, "the fact…that an injunction issues only to the parties before the court, and not to the court, is no evasion of the difficulties that are the necessary result of an attempt to exercise that power over a party who is a litigant in another and independent forum." Such a counter-injunction would be particularly inappropriate here as Bermuda is admittedly the "main proceeding."

■ A second alternative would be for this Court to refuse to recognize the 2001 Order and proceed to determine Gold Medal's motion. "No nation is under an unremitting obligation to enforce foreign interests which are fundamentally prejudicial to those of the domestic forum… the obligation of comity expires when the strong public policies of the forum are vitiated by the foreign act." *Laker Airways,* 731 F.2d at 937. This, however, would leave Gold Medal unfairly exposed. Gold Medal should not be under threat of sanctions in Bermuda for making a permissible motion in this Court.

■ A third option is for this Court to issue sanctions against the foreign representative of Hopewell for non-compliance with the 1999 Order. Sanctions can be imposed by U.S. courts against foreign litigants for willing noncompliance with U.S. orders or procedures. *United States v. First National City Bank,* 396 F.2d 897, 904–905 (2d Cir.1968); *Federal Maritime Commission v. DeSmedt,* 268 F.Supp. 972, 974 (S.D.N.Y.1967); RESTATEMENT OF THE FOREIGN RELATIONS LAW OF THE UNITED STATES § 442, comment(g). As noted above, § 306 of the Bankruptcy Code also specifically permits a bankruptcy court to condition relief on compliance with its orders. Congress intended § 306 to be a tool for the bankruptcy court to use to enforce its orders in cases in which it had limited jurisdiction over the parties. H.R.Rep. No. 595, 95th Cong. 1st Sess. 325–326 (1977), U.S.Code Cong. & Admin.News 1977, p. 5963, *reprinted in* COLLIERS, ¶ 306.03, at 306–5; S.Rep. No. 989, 95th Cong., 2d Sess. 36 (1978), U.S.Code Cong. & Admin.News 1977, p. 5787, *reprinted in* COLLIERS, ¶ 306.03, at 306–5; *see In re Laitasalo,* 196 B.R. at 925 n. 17. The reservation of jurisdiction in the 1999 Order, which confirms to Gold Medal its right to make a motion here, can be considered such a "condition" to relief.

The fact is, however, that this Court has only a secondary or derivative interest in the Bermuda proceeding. Gold Medal did not initially seek any affirmative relief in this Court, and this Court does not need to protect its jurisdiction by issuing an injunction against Hopewell. It can protect its authority by refusing Hopewell relief here. *See* RESTATEMENT OF THE LAW 2D, CONFLICT OF LAWS § 53, comment (d); RESTATEMENT OF THE FOREIGN RELATIONS LAW OF THE UNITED STATES, § 403, Reporter's Note 7.

 The Court accordingly determines that the appropriate relief would be to render the 1999 Order unenforceable so long as the 2001 Injunction remains in effect. This does not leave Hopewell without any recourse. Hopewell has had the benefit of the 1999 Order for more than two years, has carried out its Scheme in large part, and has satisfied all creditors other than Gold Medal. Assuming that Hopewell has remaining interests in this country, if the 1999 Order is vacated, Hopewell would not be without remedies should Gold Medal take action against it or its property interests here. Hopewell might even be able to rely on the 1998 Bermuda Injunction and the Scheme of Arrangement and ask the relevant tribunal to give comity to those proceedings. *See Cunard,* 773 F.2d at 460; *Victrix Steamship Co. v. Salen Dry Cargo A.B.,* 825 F.2d 709, 713–714 (2d Cir.1987); *Philadelphia Gear Corp. v. Philadelphia Gear de Mexico S.A.,* 44 F.3d 187, 193 (3d Cir.1994). Whether such tribunal should or should not recognize the 1998 Injunction and Scheme are not issues this Court can determine. But Hopewell would not be entitled to rely on the 1999 Order, one of whose terms it has sabotaged.

As noted above, an appeal is pending from the 1999 Order. The appropriate procedure in cases such as this is for a lower court that believes an order on appeal should be modified or vacated is to recommend to the appellate court that the matter be remanded for appropriate relief. Accordingly, this Court recommends that the 1999 Order be remanded for the purposes set forth above, and Gold Medal is directed to bring this recommendation to the appropriate attention of the District Court and to settle appropriate orders as necessary. If the 2001 Injunction is vacated before a remand is effected, this Court will instead restore Gold Medal's motion to modify or vacate the 1999 Order the calendar for a hearing on the merits and a further recommendation, if necessary, to the District Court.